ESTATE OF Aaron ZIMMERMAN; Kathryn Watkins, Administratrix, a/k/a Catherine Watkins, Executrix; and Linda Pardo, Individually and as heir to the Estate of Aaron Zimmerman, a/k/a Aaron Thomas Zimmerman

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY; Amtrak; Consolidated Rail; and the City of Philadelphia.

Civil Action No. 96–6907.

United States District Court, E.D. Pennsylvania.

June 22, 1998.

Kenneth R. Schuster, Matthew Hanna, Media, PA, Robert James Jackson, Jackson Le Gros, Springfield, PA, Frank J, Marcone, Media, PA, for Estate of Aaron Zimmerman, Kathryn Watkins and Linda Pardo.

Joseph J. McAlee, Steven N. Cherry, Gallagher, Reilly & Lachat, P.C., Philadelphia, PA, Wilfred T. Mills, Jr., Philadelphia, PA, for Southeastern Pennsylvania Transportation Authority.

Paul F. X. Gallagher, Steven N. Cherry, Gallagher, Reilly & Lachat, P.C., Philadelphia, PA, Wilfred T. Mills, Jr., Philadelphia, PA, for Amtrak.

Joseph J. McAlee, Steven N. Cherry, Gallagher, Reilly & Lachat, P.C., Philadelphia, PA, Joseph M. Taylor, Consolidated Rail Corp., Philadelphia, PA, Wilfred T. Mills, Jr., Philadelphia, PA, for Consolidated Rail.

Audrey L. Greenhall, City of Philadelphia, Law Dept., Philadelphia, PA, for City of Philadelphia.

Joseph J. McAlee, Gallagher, Reilly & Lachat, P.C., Philadelphia, PA, for National Railroad Passenger Corp., Movant.

## ORDER AND MEMORANDUM

DuBOIS, District Judge.

### ORDER

**AND NOW,** to wit, this 22nd day of June, 1998, upon consideration of the following Motions:

1. The Motion of defendant Consolidated Rail Corporation ("Conrail") for Summary Judgment (Doc. No. 23, filed November 25, 1997);

2. The Motion of defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") for Summary Judgment (Doc. No. 24, filed November 25, 1997);

3. The Motion of defendant National Railroad Passenger Corporation ("Amtrak") for Summary Judgment (Doc. No. 25, filed November 25, 1997); and

4. The Motion of defendant City of Philadelphia for Summary Judgment (Doc. No. 29, filed November 25, 1997);

and upon consideration of the following additional submissions of the parties: Supplemental Memorandum in Support of Defendant, Conrail's, Motion for Summary Judgment (Doc. No. 32, filed February 28, 1998), plaintiffs' Response to the Motion for Summary Judgment Filed By the Defendant Conrail (Doc. No. 35, filed April 15, 1998), Supplemental Memorandum in Support of Defendant, SEPTA's, Motion for Summary Judgment (Doc. No. 30, filed February 28, 1998), plaintiffs' Response to the Motion for Summary Judgment Filed By the Defendant SEPTA (Doc. No. 33, filed April 15, 1998), Supplemental Memorandum in Support of Defendant, Amtrak's, Motion for Summary Judgment (Doc. No. 31, filed February 28, 1998), plaintiffs' Response to the Motion for Summary Judgment Filed By the Defendant Amtrak (Doc. No. 36, filed April 15, 1998), plaintiffs' Response to the Motion for Summary Judgment Filed By the Defendant City of Philadelphia (Doc. No. 34, filed April 15, 1998), plaintiffs' Supplemental Response to the Defendants' Motions for Summary Judgment (Doc. No. 38, filed May 29, 1998), defendant Conrail's Reply Brief to Plaintiffs' Initial and Supplemental

Response to Conrail's Motion for Summary Judgment (Doc. No. 40, filed June 5, 1998), defendant SEPTA's Reply Brief to Plaintiffs' Initial and Supplemental Response to SEPTA's Motion for Summary Judgment (Doc. No. 42, filed June 5, 1998), defendant Amtrak's Reply Brief to Plaintiffs' Initial and Supplemental Response to Amtrak's Motion for Summary Judgment (Doc. No. 41, filed June 5, 1998), and Reply Memorandum of Law in Support of Defendant City of Philadelphia's Motion for Judgment on the Pleadings (Doc. No. 39, filed June 3, 1998),[1] for the reasons set forth in the accompanying Memorandum, **IT IS ORDERED** as follows:

1. The Motion for Summary Judgment of defendant Consolidated Rail Corporation (Doc. No. 23, filed November 25, 1997), is **GRANTED**.

2. The Motion for Summary Judgment of defendant Southeastern Pennsylvania Transportation Authority (Doc. No. 24, filed November 25, 1997), is **GRANTED**.

3. The Motion for Summary Judgment of defendant National Railroad Passenger Corporation (Doc. No. 25, filed November 25, 1997), is **GRANTED**.

4. The Motion for Summary Judgment of defendant City of Philadelphia (Doc. No. 29, filed November 25, 1997), is **GRANTED**.

5. **JUDGMENT** is **ENTERED** in favor of defendants Consolidated Rail Corporation, Southeastern Pennsylvania Transportation Authority, National Railroad Passenger Corporation, and the City of Philadelphia, and against plaintiffs Kathryn Watkins, a/k/a Catherine Watkins, Administratrix of the Estate of Aaron Zimmerman, and Linda Pardo, individually and as heir to the Estate of Aaron Zimmerman.

---

1. Because the City of Philadelphia has not filed a Motion for Judgment on the Pleadings in this case, the Court assumes that the City intended its filing to support it Motion for Summary Judgment.

*MEMORANDUM*

## I. Background

The claims in this case arise out of the death by electrocution of Aaron Zimmerman ("decedent"). On August 6, 1994, Mr. Zimmerman entered an area east of the 30th Street Train Station in Philadelphia—an area through which trains run—where he climbed onto a structure initially characterized as a "tower" by plaintiffs and later referred to as a support structure for a "catenary" by defendants.[2] It was upon this catenary structure that decedent received the electrical shock which eventually killed him. Plaintiffs assert that four defendants are liable for this death: SEPTA, Conrail, Amtrak and the City of Philadelphia (the "City"). Plaintiffs claim that each of these defendants had some control, possession or at least access to the area in which Mr. Zimmerman was electrocuted and that liability flows from that control, possession or access. Plaintiffs additionally allege that the City not only had possession, control or access, but had a duty to ensure that members of the public could not reach the area where the catenary structure involved in the accident was located.

A central issue to resolution of the within Motions is who had possession and control of the catenary structure and the surrounding area. The facts surrounding possession and control are disputed by the parties. Plaintiffs allege that Amtrak had a contractual arrangement with other defendants which governed access to and control of the area of the accident. Defendants deny the existence of any such agreement and plaintiffs have offered no proof of its existence. SEPTA has acknowledged that at the time of the accident it was in sole possession and control of the area and Amtrak has said that it supplied the electricity used by SEPTA, but was not responsible for the maintenance or control of the catenary structure or the electrical system. Defendants have submitted the deposition testimony of SEPTA employees in support of these claims. Plaintiffs

---

2. In the context of this case, a catenary structure is a large steel framework which supports wires through which electricity passes and is eventually supplied to trains.

offer no proof of their allegations with respect to possession and control of the area.

Also critical to a resolution of the within Motions is whether the defendants knew, or should have known, of the presence of trespassers in the area of the catenary structure before Mr. Zimmerman's accident. As evidence that defendants were aware, or should have been aware, of the presence of trespassers in that area, plaintiffs have submitted photographs—which they allege, in argument and without substantiation, were taken "almost immediately after" the accident—and a videotape of a television news report broadcast at the time of the accident which show that the wall on one side of the railroad tracks is covered with graffiti.

Plaintiffs also submitted statements obtained from witnesses shortly after the accident. One witness wrote that he had "called the police at times about people climbing the fence & onto the property" and that he "always knew someone would eventually be killed there—a lot of power over there & a lot of activity. They need a good fence there." Statement of Gerald Peterson, dated October 26, 1994. He also stated that there "were kids back a few days before the burn incident with bicycles. The Amtrak police caught them." *Id.* Another witness stated that "Back where the man was burned there are homeless people all the time. The police chase them and they come back." Statement of Linda Holman, dated October 26, 1994. A third witness wrote that "I can't say that I have ever had occasion to chase anyone away from that area and I don't know of any other incidents there." Statement of Kenneth Magobet, dated October 26, 1994.

Plaintiffs additionally allege that there is a "causeway" leading from a bridge running above the tracks to the area in which the electrocution occurred. This "causeway" is, they say, used by homeless people and a tunnel down by the tracks acts as a "magnet"

for the homeless, a class in which Mr. Zimmerman is alleged to have been a member. Plaintiffs offer no evidence of these allegations, raised in their Supplemental Response, and the photographs submitted as exhibits to that Response do not show any evidence of such a "causeway."

Finally, SEPTA acknowledges that after a circuit was initially tripped by Mr. Zimmerman coming into contact with a power line connected to the catenary structure, the "power director," Paul Lazarus, a SEPTA employee, re-energized the circuit. Electricity was thereafter cut off manually after SEPTA was informed by the fire department that a person was on the catenary structure. Plaintiffs allege that this is evidence of willful or wanton misconduct on the part of SEPTA. In response, SEPTA submitted part of a transcript of Mr. Lazarus' deposition in which he stated that had Mr. Zimmerman come into contact with any wires after they had been re-energized, he would have tripped the breaker again. That did not happen. Moreover, plaintiffs offer no evidence that such re-energization of the circuit after the initial outage was out of the ordinary.[3]

Plaintiffs' Complaint sounds in two counts: Count I alleges that the defendants are jointly and severally liable for Aaron Zimmerman's wrongful death (presumably under the Wrongful Death Act, 42 Pa.C.S.A. § 8301, although plaintiffs do not refer to it in their Complaint); Count II states that the defendants are jointly and severally liable in a survival action (presumably under the Survival Act, 42 Pa.C.S.A. § 8302, although again, plaintiffs do not cite or refer to the statute.)[4]

## II. Legal Standard

In deciding a motion for summary judgment the Court must determine whether

---

**3.** There remain other issues which are in dispute, such as those concerning the decedent's mental state at the time of the accident, but they are not implicated by any of the defendants' Motions and the Court has not set forth those disputed facts.

**4.** This case was originally filed in the Court of Common Pleas of Delaware County but was removed on notice filed by Amtrak under 28 U.S.C.

§ 1441; the Court exercises federal question jurisdiction pursuant to 28 U.S.C. § 1331 as Amtrak is a congressionally chartered corporation in which the United States owns "more than one-half of [the] capital stock." *28 U.S.C. § 1349; see also Landman v. Borough of Bristol,* 896 F.Supp. 406, 407–408 (E.D.Pa.1995).

there exist any triable issues of fact. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant the motion if it finds that the pleadings, together with depositions, admissions, answers, interrogatories, and affidavits present "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In responding to a motion for summary judgment, the non-moving party must present "more than a mere scintilla of evidence in its favor" and may not rely on unsupported assertions or conclusory allegations. *See Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). "When considering a motion for summary judgment, the court must view all evidence in favor of the non-moving party.... Additionally, all doubts must be resolved in favor of the non-moving party." *Securities and Exchange Commission v. Hughes Capital Corp.,* 124 F.3d 449, 452 (3d Cir.1997) (citations omitted). With these standards in mind, the Court will address each defendant's Motion.

## III. Discussion

### A. SEPTA's Motion for Summary Judgment

SEPTA acknowledges that it possessed and controlled the catenary system upon which the decedent was electrocuted but maintains that nonetheless, it cannot be liable to plaintiffs as a matter of law. SEPTA's primary argument is that because the decedent was a trespasser, the only duty it owed the decedent was to refrain from willful or wanton misconduct, which plaintiffs not only cannot demonstrate, but have not even alleged. SEPTA also maintains that this is the proper standard—even though electricity was involved—as there is no special duty owed trespassers as a result of the presence of live electrical wires. Additionally, SEPTA contends that none of the exceptions to the general rule governing a property owner's duty to trespassers is present in this case. Finally, SEPTA argues in the alternative that should a simple negligence standard apply, the decedent assumed the risk of his electrocution, was more than fifty percent

negligent (and therefore cannot recover under Pennsylvania law), and is barred from recovery because his behavior was willful or wanton. Plaintiffs' principal response is that they are proceeding under a *res ipsa loquitur* theory, an assertion that is made in both their initial and supplemental filings. The Court will first address this—frequently reiterated—claim regarding the *res ipsa loquitur* doctrine.

■ In arguing that *res ipsa loquitur* applies in this case, plaintiffs refer to defendants' "exclusive control" of the catenary system and state that this control "activates" the *res ipsa loquitur* doctrine. They then state that the "doctrine shifts the burden of proof onto the defendant who has exclusive control to explain what happened...." The Court rejects this argument.

The "exclusive control" requirement is part of an evidentiary scheme abandoned by the Pennsylvania Supreme Court in *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94 (1974). In *Gilbert,* the Supreme Court adopted the Restatement (Second) of Torts § 328D which states that:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

 (a) the event is of a kind which ordinarily does not occur in the absence of negligence;

 (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

 (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

Restatement (Second) of Torts § 328D (1965). The court went on to note that "the Restatement rule ... disavows the requirement of 'exclusive control.'" *Gilbert,* 327

A.2d at 101. In addition, the court stated that "[w]hen *res ipsa loquitur* is properly regarded under section 328D as a simple matter of circumstantial proof, it cannot realistically be viewed differently from any other method of circumstantially proving facts in issue.... Circumstantial evidence in all negligence cases therefore can create only a permissible inference of fault 'unless the facts are so compelling that no reasonable man could reject it.'" *Id.* at 103 (quoting Restatement (Second) of Torts § 328D, comment m). In other words, in Pennsylvania, *res ipsa loquitur* does not shift the burden of proof, it merely allows the factfinder to determine that a party is negligent based on circumstantial evidence. With this understanding of the *res ipsa loquitur* doctrine in mind, the Court turns to the arguments of defendant SEPTA.

### 1. The Proper Standard Applicable to Defendant's Conduct

Underlying their misplaced reliance on the *res ipsa loquitur* doctrine, is plaintiffs' assumption that simple negligence is the proper standard in this case. This is an incorrect assumption. As set forth below, the Court concludes that SEPTA may only be held liable if it acted willfully or wantonly.

#### a. Decedent's Status on the Property

The first step in the analysis of the proper standard is a determination of the decedent's status when he entered SEPTA's property. In their supplemental filing, plaintiffs argue that the decedent was not a trespasser, but instead was an invitee or licensee on the property. Plaintiffs cite *Schorah v. Baltimore and Ohio R. Co.*, 596 F.Supp. 256 (D.C.Del.1984), for this proposition. *Schorah* arose out of an accident in which the plaintiff—operating a motorcycle—crashed into a barrier placed by defendants across their private construction access road. Prior to the accident, the plaintiff, as well as other members of the public, frequently rode their motorcycles on that road; plaintiff claimed that he had received permission to do so and that the defendant was aware of the motorcyclists. The defendant denied these contentions during the litigation. After examining these facts, the court concluded that there was a genuine issue of material fact as to whether the plaintiff was an invitee, licensee or trespasser. Because a different liability standard would apply depending on the plaintiff's status, the Court declined to grant the defendant's motion for summary judgment.

Plaintiffs also rely on *Carpenter v. Penn Central Transp. Co.*, 269 Pa.Super. 9, 409 A.2d 37 (Pa.Super.1979), for their contention that decedent was not a trespasser. In that case, the plaintiff's decedent was electrocuted after climbing on top of a train in Philadelphia's Suburban Station and coming into contact with the pantograph (the device through which electricity is transferred from overhead wires to the train). After having been robbed at knife point, stripped and stabbed in the leg, the decedent climbed on top of the train in order to retrieve his clothes which had been thrown there by the robber. The court held that a person "is privileged to enter [another's property] 'for the purpose of removing a chattel to the immediate possession of which the actor is entitled, and which has come upon the land otherwise than with the actor's consent....'" *Id.* at 39 (quoting Restatement (Second) of Torts § 198). As a result, the court went on to conclude that the decedent's status was not so clearly established that the lower court could have decided he was a trespasser as a matter of law.

The unique facts of *Carpenter* make it inapposite in the instant matter; nor does *Schorah* support the plaintiffs' position that the decedent was anything other than a trespasser in this case. The Restatement (Second) of Torts defines a trespasser as one "who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329; *see also T.A. v. Allen*, 447 Pa.Super. 302, 309, 669 A.2d 360 (Pa.Super.1995) (citing § 329 with approval). A licensee is one who may "enter or remain on land only by virtue of the possessor's consent," Restatement (Second) of Torts § 330, and an invitee is either "a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public" or "a person who is invited to

enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Id.* at § 332; *see also Allen,* 447 Pa.Super. at 309–10, 669 A.2d 360 (citing §§ 330, 332 with approval).

Plaintiffs have presented no evidence that SEPTA (or any other defendant) consented to the decedent's presence on its property or invited him onto the property. Indeed, in the photographs submitted by plaintiffs of the area surrounding the catenary structure, "Danger Live Wire" signs can be seen posted on concrete or stone barriers—walls—topped by a spiked grill and a statement submitted by plaintiffs of a witness describes trespassers as climbing a "fence" to get onto the property. In the photographs, it can be seen that those barriers to entry are substantial—taller than a man visible in one of the pictures—and that they have been erected on both sides of the tracks. Although the evidence submitted does not show every possible approach to the area where the accident occurred, there is no evidence of any gap in the walls and fences surrounding the tracks. Thus, the Court concludes that decedent had to climb at least one of these barriers in order to gain access to the catenary structure. In light of all of the evidence, the Court concludes that there is no genuine issue as to whether the decedent in this case was a trespasser: he was. With this conclusion in mind, the Court turns to the other arguments of the parties.

### b. The Standard Governing the Duty Owed to a Trespasser

■ Because the decedent in this case was a trespasser, defendant SEPTA is correct when it argues that under Pennsylvania law, plaintiffs may only recover if SEPTA acted wantonly or willfully. *See, e.g., Micromanolis v. The Woods School, Inc.,* 989 F.2d 696, 700 (3d Cir.1993) (" 'a plaintiff who is a trespasser can recover only if the defendant is guilty of wanton or wilful misconduct' ") (quoting *Graham v. Sky Haven Coal, Inc.,* 386 Pa.Super. 598, 563 A.2d 891, 897 n. 8 (1989)); *see also Howell v. CSX Corp.,* 1997 WL 44843 (E.D.Pa. Jan.30, 1997) (holding that defendants were not liable to a trespasser in the absence of willful or wanton miscon-

duct). This conclusion in turn means that plaintiffs may not rely on the doctrine of *res ipsa loquitur,* for that doctrine applies only to negligence actions. *See, e.g., Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94 (1974) (adopting Restatement (Second) of Torts § 328D); *Krivijanski v. Union R. Co.,* 357 Pa.Super. 196, 515 A.2d 933, 936–37 (Pa.Super.1986) (holding that wanton misconduct is "different not merely in degree but in kind" from negligence (internal quotation omitted)). In order to survive SEPTA's motion for summary judgment, therefore, there must be a genuine issue of material fact as to whether defendants acted willfully or wantonly.

### 2. Plaintiffs' Failure to Plead Willful or Wanton Misconduct

■ SEPTA argues first, that plaintiffs have failed to allege any willful or wanton misconduct. In Pennsylvania, such a failure may be fatal to a claim. *See Engel v. Friend's Hospital,* 439 Pa. 559, 266 A.2d 685, 687 (1970) (affirming dismissal for failure to plead willful or wanton misconduct). However, the Court concludes that plaintiffs' allegation that the defendants "did grossly fail to correct the condition formed by the dangerous instrumentality and both negligently and intentionally did permit the condition to exist ...," Complaint & 45, amounts to an allegation of willful or wanton misconduct under the liberal pleading requirements of the federal rules. *See* Fed.R.Civ.P. 8. Thus, the Court rejects SEPTA's argument that plaintiffs' Complaint fails to allege such misconduct. To the contrary, plaintiffs' allegations, although far from a model of clarity, sufficiently put all defendants on notice of the willful or wanton misconduct claim.

### 3. Exceptions to the Willful or Wanton Misconduct Requirement

#### a. Restatement (Second) of Torts §§ 334 and 335

■ SEPTA argues that no exception to the wantonness or willfulness requirement applies in this case. The Court agrees. The "exception" to the general rule, discussed at length by SEPTA, that possessors of land are not liable to trespassers is the one set

forth in Restatement (Second) of Torts §§ 334.[5] Section 334 states that:

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving the risk of death or serious bodily harm with reasonable care for their safety.

Restatement (Second) of Torts § 334. Pennsylvania courts have applied this section in a limited fashion; they add to it a requirement that there be a showing of willfulness or wantonness on the part of a defendant. *See Howell v. CSX Corp.*, 1997 WL 44843 at *5 (E.D.Pa.1997). However, § 334 does not apply in this case because the catenary structure and the wires are not an "activity" within the meaning of that section.

■ Restatement (Second) of Torts § 335 sets forth the conditions under which a possessor of land may be liable for injury to a trespasser caused by an "artificial condition" on the property. The catenary structure and the wires it supports are most appropriately classified as an "artificial condition." *See, e.g., Carter v. United States Steel Corp.*, 529 Pa. 409, 604 A.2d 1010 (1992) (case brought under Restatement (Second) Torts § 339—stating rule for liability of landowners for "Artificial Conditions" dangerous to trespassing children—in which the court treated an "electrical transmission tower" on defendant's property as an "artificial condition"). Section 335 provides that:

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if (a) the condition (i) is one which the possessor has created and maintains and (ii) is, to his

knowledge, likely to cause death or seriously [sic] bodily harm to trespassers and (iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and (b) the possessor has failed to warn trespassers of the condition and the risk involved.

Restatement (Second) of Torts § 335. Although that is the controlling standard in some jurisdictions, the Third Circuit has held that Pennsylvania has declined to adopt § 335. *See Micromanolis*, 989 F.2d at 700 (citing *Graham v. Sky Haven Coal, Inc.*, 386 Pa.Super. 598, 563 A.2d 891, 897 n. 8 (Pa.Super.1989)); *see also Howell*, 1997 WL 44843, *5 ("[I]t is not surprising that our courts have not adopted Section 335 . . . but instead have explicitly rejected it.").[6] Thus, it would be inappropriate for the Court to rely on analyses of that provision in deciding this case.

### b. Attractive Nuisance and Permissive Crossing Doctrines

■ Plaintiffs cite *Erie R. Co. v. Kazanecki*, 10 F.2d 337 (3d Cir.1925) for the proposition that defendants established a "permissive use" of the property because defendants had knowledge that members of the public frequented the area around the catenary structure at issue in this case. The Court will return to the question of SEPTA's knowledge of trespasser's below; with respect to the *Kazanecki* case, however, plaintiffs arguments are unavailing. First, the facts in *Kazanecki*'s clearly involve the presence of trespassing children:

[A] railroad company has the right to the exclusive use of its tracks, and that any stranger, an infant or an adult, going upon them is a trespasser; yet when the children of a community have for many years constantly used a railroad yard as a play-

---

**5.** In their Complaint, plaintiffs cite Restatement (Second) of Torts § 343, but as that section deals with liability toward invitees, the Court examines only the similar provisions dealing with the duty owed to trespassers set forth in Restatement (Second) of Torts §§ 334 and 335.

**6.** The Supreme Court of Pennsylvania has cited § 335 with approval, *see Franc v. Pennsylvania Railroad*, 424 Pa. 99, 225 A.2d 528, 529 (1967),

but the Superior Court later wrote that *Franc* "does not amount to an adoption of § 335 as the law of Pennsylvania." *Graham*, 563 A.2d at 896 n. 8. The Third Circuit in *Micromanolis* relied on this statement in *Graham*, as well as a concurrence and dissent in *Franc*, in reaching its conclusion that Pennsylvania has declined to adopt § 335. This Court is bound by the holding of the Third Circuit.

ground, with the company's knowledge and acquiescence, the rights and duties of the parties change; children so using the yards and tracks are not trespassers, and there arises in the railroad company the duty to exercise care towards them as persons whose presence is permitted and therefore to be anticipated.

*Kazanecki,* 10 F.2d at 338. Thus, the case is really one involving what is known as the "attractive nuisance" doctrine, *see, e.g., Allen,* 447 Pa.Super. 302, 669 A.2d 360 (using that term when referring to Restatement (Second) of Torts § 339), which imposes liability, under certain conditions, on a possessor of land if harm is caused to trespassing children. *See* Restatement (Second) of Torts § 339; *see also Long v. Manzo,* 452 Pa.Super. 451, 682 A.2d 370, 374 (Pa.Super.1996) (relying on § 339). Because the decedent was not a child, neither the attractive nuisance doctrine nor *Kazanecki* apply to this case.

■■■ Second, to the extent plaintiffs are invoking the "permissive crossing" doctrine—by which an implied license can be created where the public frequently crosses railroad tracks at a certain location—defendant SEPTA correctly argues that the doctrine has no place in this case. To apply, the doctrine requires that there be a "well defined location of the way in a limited area," *Henry v. Pennsylvania R. Co.,* 368 Pa. 596, 84 A.2d 675, 677 (1951) (citation omitted), and that the crossing be "frequently, notoriously, and continuously used by the public." *Conn v. Pennsylvania R. Co.,* 288 Pa. 494, 136 A. 779, 781 (1927); *see also Gaul v. Consolidated Rail Corp.,* 383 Pa.Super. 250, 556 A.2d 892, 894 (Pa.Super.1989). Although plaintiffs have alleged the existence of a "causeway" in their Supplemental Response, they have not only not submitted evidence to show the frequent use of such a passage, they have not even submitted evidence of the existence of such a passage. The Court concludes, therefore, that the "permissive crossing" doctrine plays no role in this case.

### c. Dangerous Condition

■■■ Plaintiffs argue that because SEPTA maintained a dangerous condition—electrici-

ty—on its property, it is subject to a heightened standard of care and plaintiffs need not demonstrate willful or wanton misconduct. In support of this position, plaintiffs cite *Colloi v. Philadelphia Electric Co.,* 332 Pa.Super. 284, 481 A.2d 616 (Pa.Super.1984) in which the court held that a supplier of electricity had a duty to warn the independent subcontractors of a property owner of any non-obvious, dangerous condition inherent in working in close proximity to high-tension wires. Plaintiffs also rely on *Bailey v. Pennsylvania Electric Co.,* 409 Pa.Super. 374, 598 A.2d 41 (Pa.Super.1991) to support their position that those dealing with electricity are subject to a heightened duty of care. In *Bailey,* the court held that the defendant electric company was subject to liability where an aircraft crashed into power lines. The court based its decision on the premise that suppliers of electricity must meet a heightened duty of care. Plaintiffs draw from these cases the argument that electricity is so dangerous that even where it was not the electricity itself, but merely the wires carrying the current which caused an accident, the supplier is subject to a heightened duty.

■■■ These cases, however, are inapposite. Defendants argue in response, and the Court agrees, that while a heightened duty undeniably exists with respect to the supply of electricity—or any inherently dangerous activity—it has been applied only in the context of those lawfully in proximity to the electricity. *See Heller v. Consolidated Rail Corp.,* 576 F.Supp. 6, 12 (E.D.Pa.1982) ("[H]eightened duty of care extends only to those lawfully in proximity to the wires. *Brillhart [v. Edison Light and Power Co.,* 368 Pa. 307, 82 A.2d 44 (1951) ]. The standard of care owed to trespassers by suppliers of electricity is a duty to avoid wilful and wanton injury. *See Riedel v. West Jersey & S.R. Co.,* 177 F. 374 (3d Cir.1910); *Walsh v. Pittsburg Ry. Co.,* 221 Pa. 463, 70 A. 826 (1908)."). The plaintiffs in *Colloi* were lawfully on the property; it has also long been established that aircraft have a right of way and thus, the aircraft in *Bailey* was in legal proximity to high tension lines. *See Yoffee v. Pennsylvania Power & Light Co.,* 385 Pa.

520, 123 A.2d 636, 639 (1956) (citations omitted) (holding that aircraft have a right of way and relied on by *Bailey* ). The Court concludes that the presence of electricity does not alter the requirement in this case that plaintiffs demonstrate willful or wanton misconduct on the part of SEPTA. The question then, is whether there is sufficient evidence of such conduct to create a genuine issue of material fact.

### 4. Application of the Willful or Wanton Misconduct Standard

 Willful misconduct " 'means that the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain that it would ensue. This, of course, would necessarily entail actual prior knowledge of the trespasser's peril.' ... Therefore, to maintain a cause of action from [sic] negligence due to wilful misconduct, the plaintiffs must allege that the defendants desired to bring about the descendant's [sic] injuries, or at least were aware that it was substantially certain that he would be injured." *Howell*, 1997 WL 44843, *6 (quoting *Evans v. Philadelphia Trans. Co.*, 418 Pa. 567, 212 A.2d 440, 443 (1965)). There is no evidence in this case that SEPTA "desired to bring about" the decedent's electrocution or that it was substantially certain decedent in particular "would be injured." Thus, the Court concludes that plaintiffs cannot show that SEPTA acted willfully. The remaining question then is whether SEPTA acted wantonly.

The Third Circuit has said that under Pennsylvania law, *wanton misconduct*:

means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, and not a desire to bring them about; as such, actual prior knowledge of the particular person's peril is not required. It is enough that the actor realizes, or at least has knowledge of sufficient facts that would cause a reasonable man to realize, that a peril exists, for

a sufficient time beforehand to give the actor a reasonable opportunity to take means to avoid the injured person's accident; the actor is wanton for recklessly disregarding the danger presented.

*Micromanolis*, 989 F.2d at 701 (quotation omitted) (holding that even if defendant was aware of trespassers, he "could not reasonable be charged with knowledge ... that a trespasser might dive in the middle of the unlighted pool at night without checking the water level"); *see also Howell*, 1997 WL 44843 at *7 (holding that it could not be said that defendant railroad should have been aware of the risk that a driver would accidentally cross onto private road and get stuck on a railroad trestle).

 Plaintiffs, although consistently maintaining that a simple negligence standard should apply, submit as proof of defendant's *willful or wanton misconduct*, evidence that the area surrounding the catenary structure upon which decedent was electrocuted was covered with graffiti and debris. This evidence, plaintiffs contend, is sufficient for a jury to conclude that defendant SEPTA had knowledge that trespassers frequented the area; defendant's failure to ensure the safety of those trespassers, plaintiffs argue, amounted to willful or wanton misconduct. Plaintiffs further argue that the action of the SEPTA "power director"—the person responsible for monitoring the electrical system running the trains—in re-energizing the circuit that had been tripped when decedent was electrocuted is also evidence of willful or wanton misconduct. They rely on *Carpenter*, 409 A.2d at 38, for this contention.

In setting out the facts of *Carpenter*, the court noted that the "power director" in that case immediately re-energized the circuit tripped by the decedent in that case. It also noted that in 1974, 1190 outages had occurred and that it was common practice for the "power director" to instantly re-energize since such outages were usually the result of birds, icicles and other small objects coming into contact with the power lines. *See id.* at 38. These facts, however, played no role in the court's decision and there was no discussion of the willful or wanton misconduct requirement. *See id.* at 39 (holding only that

under the facts of the case, decedent was not necessarily a trespasser). *Carpenter* does not, therefore, support plaintiffs' position and in the present case there is no evidence that re-energizing the circuit was out of the ordinary or even negligent, let alone willful or wanton. Moreover, what evidence there is in this case establishes that the re-energization caused no further injury to the decedent, for Paul Lazarus, the "power director" on duty at the time of the accident, stated in his deposition that had the decedent contacted the wire after it had been re-energized, "he would have tripped the breaker again," Def. Ex. F at 54, and there is no evidence that occurred. Although the Court concludes that the re-energization of the circuit is not evidence of willful or wanton misconduct, the question remains whether SEPTA was aware of trespassers before the accident and if so, whether decedent's electrocution was the result of wanton misconduct.

■ Plaintiffs allege that defendants failed to warn the decedent of the danger associated with the catenary structure, presumably because there were no warning signs posted on the structure itself. However, plaintiffs offer no proof to support this contention. The photographs submitted with their supplemental filing show that some of the walls and fencing around the area contained "Danger Live Wire" signs. It is impossible to determine from these photographs, however, whether the area immediately surrounding the catenary at issue contained warning signs or if there were other means of accessing the area. Plaintiffs submitted a video tape in which a news report broadcast at the time of the accident shows the decedent being rescued by fire fighters after being electrocuted. The video shows graffiti on the inside of the walls and fencing and no warning signs were visible, although the camera was tightly focussed on the decedent as he struggled to climb off the structure.

Defendants contend that the area around the bridge which led to the catenary structure was posted with warning signs, including ones indicating "live wires." It also notes that the area was fenced. As proof of these contentions, defendants have attached deposition testimony to their Motions. Upon reading those portions of the depositions attached, the Court finds that Officer Dawn Lyles did testify that there was a fence around the area. She also stated that there was no graffiti, Def. Ex. D at 28, but later admitted that she cannot recall if there was graffiti or not. Def. Ex. D at 71. Officer Lyles recalled seeing a sign which warned of some kind of danger on the fence surrounding the area. Def. Ex. D at 52. Detective Arnaldo Puente stated that there may have been a sign having to do with voltage, but he was not certain. Def. Ex. E at 36–37. He also stated that there might have been litter or debris in the area, but he wasn't certain. Def. Ex. E at 73–74.

Viewing the evidence in the light most favorable to plaintiffs, the Court, for purposes of the within Motion, finds that SEPTA knew or should have known of the presence of trespassers in the area around the catenary. The evidence in the photographs submitted by plaintiffs, along with the video tape evidence and statements of witnesses, are sufficient to demonstrate that the area around the catenary structure was covered in graffiti. Although plaintiffs have failed to show that SEPTA was otherwise aware of the trespassers, or that the graffiti built up over time—thus indicating the continuing presence of trespassers—the graffiti was plainly visible to SEPTA personnel who operated passing trains. Consequently, SEPTA knew or should have known that there were trespassers in the area. The Court also concludes that at least some of the approaches to the catenary structure were posted with warning signs and that there were significant barriers—walls and fencing—to access of the area. That raises the question of whether SEPTA's failure to do more than erect those barriers and post warning signs amounted to wanton misconduct.

The question whether SEPTA's acted wantonly in this case turns on the question whether there is any evidence that SEPTA could not reasonably rely on the warning signs and barriers it had put in place to prevent trespassers from entering the area and climbing the catenary. For the Court to

conclude that a reasonable jury could find that SEPTA's actions were insufficient—and that it therefore engaged in wanton misconduct—there would have to be evidence of continuing trespassers ignoring the warnings and barriers and climbing the catenary structure. The mere presence of trespassers in the general area does not amount to wanton misconduct with respect to the catenary structure, for having taken steps to warn trespassers of an artificial condition, SEPTA may reasonably assume that a trespasser will not take an obvious risk, such as climbing onto a large steel framework (the catenary structure) mounted next to railroad tracks and bearing heavy cables. *See Micromanolis*, 989 F.2d at 702 (stating that defendant in that case had not posted warning signs or taken other safety precautions despite being aware of trespassers but holding that did not amount to wanton misconduct because defendant need not take steps to protect trespassers from the obvious risk of jumping into an unlighted swimming pool at night since defendant could not "know" of such a risk under the law).

In this case, the Court finds no evidence of wanton misconduct. The posting of warning signs and the presence of barriers were reasonably adequate steps to protect trespassers from the catenary structure. The outcome might be different had the decedent been killed by a passing train, for SEPTA knew or should have known that trespassers, in spray painting graffiti, were present on or near its tracks and as such the risk of an injury caused by a train would be "known" to defendant. *See Micromanolis*, 989 F.2d at 701–02 (holding that defendant may be liable for wanton misconduct only if risk of particular injury was "known" or "obvious" to defendant). The outcome might also be different if there were any evidence that SEPTA was aware of trespassers climbing the catenary structure before Mr. Zimmerman's accident. However, there is no such evidence in this case, and the Court finds that the catenary structure presents a sufficiently obvious danger that SEPTA cannot be charged with knowing of the risk to decedent given the steps it had taken to warn trespassers. Given this, it cannot be said that with respect to the catenary structure, SEPTA was "reck-

lessly disregarding the danger presented," *id.* at 701, by the presence of trespassers. Therefore, the Court finds that SEPTA did not engage in wanton misconduct and cannot be liable for decedent's death under the law of Pennsylvania.

### 5. Defendant's Arguments in the Alternative

As the Court has explained, the proper legal standard in this case is willful or wanton misconduct, not mere negligence. Because the Court has found no evidence that SEPTA conducted itself in a willful or wanton manner, it need not reach defendant's arguments in the alternative. Accordingly, because there is no genuine issue of material fact with respect to the claim against SEPTA, the Court has granted SEPTA's Motion for Summary Judgment.

### B. Conrail's Motion for Summary Judgment

 In its Supplemental Memorandum, Conrail contends that it "did not own, possess or control any property in the area described by plaintiffs' Complaint.... Indeed, Conrail did even not [sic] operate trains over the tracks were [sic] the incident occurred." Conrail's Supp. Memo. 2–3. As evidence of these claims, Conrail attached the deposition of Paul Lazarus, SEPTA's "power director", who testified that the relevant catenary structure is owned and maintained by SEPTA and that the tracks where the incident occurred are used solely by SEPTA. Plaintiffs produced no evidence in response but argue simply that:

> if their [Conrail's] equipment, trains and maintenance personnel could get into the area for repairs if there was a breakdown and simply due to the agreement that they could access the area in their trains defeats premise [sic] they had no 'possession' of the area. It is a wonder if they might say the fact a train belonging to them is on the tracks, stopped [sic]. Doesn't that alone give them 'possession' of the space and usage of the area. [sic].

Plaintiffs' Response at 4. Although it is possible to infer from Mr. Lazarus' deposition that a railroad company other than SEP-

TA may have used tracks in the area of the decedent's electrocution, plaintiffs simply offer no proof that Conrail used the area.

Moreover, even if Conrail operated trains over tracks in the area, it is uncontroverted that only SEPTA maintained, possessed and controlled the catenary and its supporting structure. In their Response, plaintiffs invoke the principle of *res ipsa loquitur* and also cite Restatement (Second) of Torts § 343. Section 343 is inapplicable to this case. It involves the liability of a possessor of land to invitees; the Court has concluded that the decedent was a trespasser, not an invitee, and, as set forth below, Conrail is not in possession of the land in question.

It is true, as defendant Conrail argues, that "Pennsylvania law makes clear that . . . it is the possessor of land that has the responsibility for dangerous conditions that arise on the premises." *Norman v. United States,* 1996 WL 377136, *3 (E.D.Pa. July 3, 1996) (citing *Bagley v. Philadelphia,* 148 Pa.Super. 318, 25 A.2d 579, 582 (Pa.Super.1942); *Whitaker v. Hills,* 430 F.Supp. 1389, 1390–91 (E.D.Pa.1977); Restatement (Second) Torts § 328E). While under Pennsylvania law the question of possession is generally one for the trier of fact, *see, e.g., Blackman,* 664 A.2d at 142, the Court concludes that there is no genuine issue of material fact in this case. It is apparent from the evidence produced that defendant Conrail did not possess the land or catenary structure upon which decedent was electrocuted.

As the Court understands plaintiffs' argument in response—quoted above—their theory is that Conrail uses tracks near the catenary structure and because its maintenance personnel must have access to that area if a train breaks down, it is liable for the injury to decedent. This argument is of no avail, however, for even if true, it would not make Conrail a "possessor" of the property at issue in this case.

Because there is no genuine issue of material fact with respect to the claim against Conrail, the Court has granted defendant Conrail's Motion for Summary Judgment.

## C. Amtrak's Motion for Summary Judgment

Like Conrail, Amtrak argues that it is not liable because it did not have possession or control of the catenary structure and did not use the tracks to which that structure supplied electricity. As proof, Amtrak submits the deposition testimony of SEPTA employees. Plaintiffs contend in response that there is an agreement between the parties "which spells out the arrangements between them related to the duties and responsibilities of either party" for maintenance of the catenary structure and surrounding area. Plaintiffs say they have been promised a copy of this agreement but that it has not been forthcoming. During a telephone conference between the Court and the parties' attorneys on May 18, 1998, the counsel for defendants denied any knowledge of such an agreement. Plaintiffs did not even mention the existence of such a contract in their Response filed after that telephone conference, and, as no evidence of such a contract has been provided, the Court will not accept the unsubstantiated allegations of plaintiffs in deciding Amtrak's Motion for Summary Judgment. The Court therefore concludes that there is no genuine issue of material fact as to whether Amtrak possessed or controlled the relevant catenary structure or its surroundings: it did not.

Nonetheless, Amtrak acknowledges that it supplied the electricity which runs through the catenary. The question arises, therefore, whether Amtrak owed a duty to the decedent because of its status as a supplier of electricity. Amtrak contends that, despite supplying the electricity, it cannot be held liable for problems with the catenary system because "the duty to inspect and maintain power lines rest with the company in possession of said power lines. . . ." *Smithbower v. Southwest Central Rural Electric Cooperative, Inc.,* 374 Pa.Super. 46, 542 A.2d 140, 144 (Pa.Super.1988) (citation omitted); *see also Bloom v. Waste Management, Inc.,* 615 F.Supp. 1002, 1005 (E.D.Pa.), *aff'd* 800 F.2d 1131 (3d Cir.1986) (holding that supplier of electricity is not responsible

for a user's placement of electrical lines and poles).[7] Plaintiffs attempt to distinguish *Smithbower* and note that the case has not been cited in subsequent opinions.

Plaintiffs argue that Amtrak, as supplier of electricity, is subject to a heightened duty of care which extends to a legal responsibility toward the decedent in this case. In support, plaintiffs cite *Colloi*, 481 A.2d 616, and *Bailey*, 598 A.2d 41—cases already discussed above—in which liability was imposed for injuries suffered by those lawfully in proximity to power lines. As described, the heightened duty which undeniably exists with respect to the supply of electricity—or any inherently dangerous activity—has been applied only in the context of those who, unlike the decedent, are lawfully in proximity to the electricity. *See Heller*, 576 F.Supp. at 12. The Court concludes that liability cannot be imposed on Amtrak simply because it supplied the electricity flowing through the wires supported by the catenary structure.[8]

For the reasons set forth above, the Court finds that there is no genuine issue of material fact as to the claim against Amtrak and it therefore has granted Amtrak's Motion for Summary Judgment.

### D. City of Philadelphia's Motion for Summary Judgment

The City of Philadelphia first argues that, pursuant to the Political Subdivisions Tort Claims Act, 42 Pa.C.S.A. §§ 8541 *et seq.*, it cannot be held liable as it does not fall within any of the exceptions to that Act. Specifically, the City claims that it is not a property owner with respect to the catenary structure or surrounding area. Plaintiffs initially argued that, because the City did nothing more than generally deny that it owned the property, it, in effect, admitted ownership. The plaintiffs are incorrect, however, when they assert that the City did not expressly deny ownership of the property. In its Answer, the City stated that "it is denied that the City of Philadelphia, it agents, servants or employees, owned, controlled, possessed, maintained, or had under its care, responsibility, or supervision the situs referred to in the Complaint." City's Answer ¶ 47.

This portion of the City's Answer was brought to the attention of plaintiffs' counsel during a telephone conference on May 18, 1998. Since then, plaintiffs have failed to submit any evidence that the City was a possessor of the property at issue in this case. The Court will not accept plaintiffs' unsubstantiated allegations of possession,

7. The Court notes that there is a 1914 Pennsylvania case, *Fedorawicz v. Citizens' Electric Illuminating Co.*, 246 Pa. 141, 92 A. 124 (1914) in which the Supreme Court quoted an earlier case for precisely the opposite proposition as that stated in *Smithbower:*

> That the company did not construct the line at its own expense cannot relieve it from the duty to exercise care in keeping it in proper condition and repair during the period the wire carried its electric current. The ownership of the wire cannot affect the company's liability for failure to observe this duty. . . . When charged with its electricity the wire was in the possession and control of the defendant company, so far as concerned its duty to keep it in repair and in proper condition and position to protect those who come in contact with it. The danger lay not in the wire, but in the 'subtle fluid' sent through it by the defendant company. It was not the wire which injured the boy, but the electric current which it bore from the defendant's dynamo. . . . Hence, it logically follows that, notwithstanding the ownership of the wire may have been in another, the defendant company must be considered as in possession of, as using, it at the time of

the accident, and, therefore, responsible for any injury resulting from the failure to inspect and keep it in proper condition and repair when charged with the company's electricity. *Fedorawicz* at 125 (quoting *Daltry v. Media Electric, Light, Heat and Power Co.*, 208 Pa. 403, 57 A. 833 (1904)). Neither *Fedorawicz* nor *Daltry* have been overruled, although *Smithbower* certainly stands for the opposite proposition. Plaintiffs do not raise this concern and more importantly, those cases were decided when widespread use of electricity was in its infancy; as a practical matter, those holdings would mean that the electric company could be held liable for a frayed wire in someone's home. The Court predicts that were the Supreme Court of Pennsylvania confronted with this issue, *Fedorawicz* and *Daltry* would be overruled. *See, e.g., Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 113 (3d Cir.1992) ("Absent clear guidance from the Pennsylvania Supreme Court, [this Court] must predict how [the Supreme Court of Pennsylvania] would decide the issues.").

8. Plaintiffs repeat the *res ipsa loquitur* argument with respect to Amtrak's Motion but as with the SEPTA and Conrail Motions, it is unavailing.

particularly in light of SEPTA's acknowledgment that it has sole possession and control of the area in which the catenary structure stands. *See, e.g., Williams,* 891 F.2d at 460 (holding that Court need not rely on unsupported assertions or conclusory allegations of parties on summary judgment). Because the City was not a possessor of the property at issue, as with Amtrak and Conrail, it cannot be liable for the injuries decedent sustained as a result of a condition on the property. *See, e.g., Norman,* 1996 WL 377136 at *3.

Plaintiffs argument that the City was obligated to prevent the decedent from accessing the catenary structure is equally unavailing. The City directs the Court's attention to two cases: *Scarborough v. Lewis,* 523 Pa. 30, 565 A.2d 122 (1989) and *Gardner v. Consolidated Rail Corp.,* 524 Pa. 445, 573 A.2d 1016 (1990). *Scarborough*—which is not precisely on point since in that case the City undertook to erect a fence which it did not then maintain—stands for the proposition that "it is well settled that the law imposes no duty upon a possessor of adjacent land to erect fencing or provide warnings so as to deter persons from entering a third party's property on which there exists a dangerous condition not created or maintained by the landowner and over which the landowner has no control." *Scarborough,* 565 A.2d at 126; *see also Gardner,* 573 A.2d at 1018 ("[T]he city has no common law duty to erect or repair its fences, at least as to plaintiffs who are injured on neighboring land, not on or by city property."). The law as set forth in these cases applies in this case and supports the position of the City.

Because there is no genuine issue of material fact as to the claims against the City, the Court has granted the City's Motion for Summary Judgment.

## IV. Conclusion

For the reasons set forth above, the Court has granted each defendant's Motion for Summary Judgment.