J-A20038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LARRY ARNOLD, ADMINISTRATOR OF THE ESTATE OF ERIC ARNOLD, DECEASED, ON BEHALF OF THE ESTATE OF ERIC ARNOLD, DECEASED, LARRY ARNOLD, ADMINISTRATOR OF THE ESTATE OF ERIC ARNOLD, DECEASED, ON BEHALF OF THE NEXT OF KIN OF ERIC ARNOLD, DECEASED, AND LARRY ARNOLD, IN HIS OWN RIGHT, | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | |
| RICHARD KAPOSY; AND/OR RICHARD KAPOSY D/B/A TREEMAN LANDSCAPING; AND/OR RICHARD KAPOSY D/B/A COUNTRY BOYZ CUTTING CITY TREES; AND/OR RICHARD KAPOSY D/B/A COUNTRY BOYZ TREE SERVICE; DUQUESNE LIGHT COMPANY; KAYLA WELLER; AND/OR MATTHEW WELLER | : : : : : : : : : : | No. 1693 WDA 2015 |

Appeal from the Order entered September 28, 2015
in the Court of Common Pleas of Allegheny County,
Civil Division, No(s):  GD-12-006927

BEFORE:  BOWES, STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED OCTOBER 19, 2016**

Larry Arnold ("Arnold"), administrator of the Estate of Eric Arnold ("the

Estate"), deceased, on behalf of the Estate, the next of kin of Eric Arnold

("Decedent") and in his own right, appeals from the Order entering summary

judgment against him and in favor of Richard Kaposy ("Kaposy") d/b/a

Treeman Landscaping; and/or Kaposy d/b/a Country Boys Cutting City

Trees; and/or Kaposy d/b/a Country Boys Tree Service; Duquesne Light Company ("Duquesne Light"); and Kayla Weller ("Weller") and/or Matthew Weller ("Matthew") (collectively, "the Wellers") (all Appellees collectively referred to as "Defendants"), and dismissing all claims against Defendants with prejudice. We affirm.

On April 20, 2010, Decedent was killed while trimming a tree on the Wellers' property. The Wellers had hired Kaposy, Decedent's employer, to remove a tree from their property located at 4737 Robert Drive, Pittsburgh, Pennsylvania. Kaposy sent Decedent and his brother, Arnold, to remove the tree. While Decedent was trimming the tree, a tree limb came into contact with an electric line owned by Duquesne Light. As a result, Decedent was electrocuted and died.

Arnold filed a Complaint alleging that the Wellers, as owners of the property, breached their duty of care to Decedent, who was a business invitee on the Wellers' property, causing his death. Arnold further averred that Duquesne Light breached its duty of care to the decedent, causing Decedent's death. At the close of discovery, Defendants filed a Motion for summary judgment, to which Arnold filed a Response. After argument, the trial court granted Defendants' Motion for summary judgment, and dismissed all claims against Defendants with prejudice. Arnold timely filed a Notice of appeal.

Arnold now presents the following claims for our review:

I. Whether the trial court erred in granting summary judgment in favor of [the Wellers,] where there are material issues of fact as to whether they were negligent and their negligence was a proximate cause of the injuries and damages suffered by [Decedent,] for which the [Wellers] are liable, which should be decided by a jury?

II. Whether the trial court erred in granting summary judgment in favor of Duquesne Light …[,] where there are material issues of fact as to whether [it was] negligent and [its] negligence was a proximate cause of the injuries and damages suffered by [Decedent,] for which [Duquesne Light] is liable, which should be decided by a jury?

III. Whether the trial court's entry of summary judgment in favor of [] Defendants is contrary to the applicable standard for granting summary judgment in that the trial court resolved factual issues notwithstanding language couching the decision as an absence of any genuine issue of material fact as to whether [] Defendants breached any duty of care owed to [Decedent]?

Brief for Appellant at 4 (some capitalization omitted).

"An appellate court may disturb the decision of a trial court granting or denying summary judgment pursuant to Pa.R.C.P. 1035.1-1035.5 only if it determines that the trial court committed an error of law or abused its discretion." *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1264, 1267 (Pa. 2006) (citation omitted).

Summary judgment is proper only where there is no genuine issue concerning any material fact and the moving party is entitled to judgment as a matter of law. *Karoly v. Mancuso*, 619 Pa. 486, 65 A.3d 301, 308-09 (Pa. 2013); *see also* Pa.R.C.P. 1035.2(2) (summary judgment proper if, after completion of discovery relevant to motion, adverse party who would bear burden of proof at trial fails to produce evidence of facts essential to cause of action or defense which in jury trial would require issues to be submitted to jury). In considering a motion for summary judgment, the record must be viewed in the light most favorable to the non-moving party, and all doubts as

- 3 -

to whether a genuine issue exists are resolved against the moving party. **Karoly**, [65 A.3d] at 309. The record for purposes of deciding a motion for summary judgment includes the pleadings, depositions, answers to interrogatories, admissions, and affidavits, Pa.R.C.P. 1035.1(1), (2), but oral testimony alone, of the moving party or his witnesses, *i.e.*, affidavits or depositions, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact, *see id.*, 1035.2 note (citing **Penn Center House, Inc. v. Hoffman**, 520 Pa. 171, 553 A.2d 900 (Pa. 1989); **Borough of Nanty-Glo v. Am. Sur. Co. of New York**, 309 Pa. 236, 163 A. 523 (Pa. 1932)). Moreover, "[t]he questions of whether there are material facts in issue and whether the moving party is entitled to summary judgment are matters of law." **Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.**, 106 A.3d 27, 34 n.5 (Pa. 2014) (citations omitted). Finally, our scope of review of questions of law is *de novo*, and we need not defer to the lower court's determinations. **Summers v. Certainteed Corp.**, 606 Pa. 294, 997 A.2d 1152, 1159 (Pa. 2010) (citation omitted).

**Bailets v. Pa. Tpk. Comm'n**, 123 A.3d 300, 304 (Pa. 2015).

Arnold first argues that the trial court improperly granted summary judgment in favor of the Wellers, where there existed material issues of fact as to whether the Wellers were negligent, and whether the Wellers' negligence was a proximate cause of Decedent's death. Brief for Appellant at 8. Arnold asserts that the Wellers were negligent in failing to (a) contact Duquesne Light to advise that workers trimming trees would bring them in close proximity to the overhead power lines; (b) request that Duquesne Light de-energize the lines while work was being performed, or take other necessary actions to safeguard the lives of the workers, while they performed work bringing them in close proximity to the power lines; (c) advise, instruct, inform and warn Kaposy that the work he had contracted to

- 4 -

perform would bring its employees into close proximity of the power lines; (d) warn Decedent directly and/or through his employer that the work he was to perform would bring him into close proximity with the overhead power lines; (e) exercise reasonable care to make the premises safe for Decedent; (f) advise Decedent that the overhead power lines were energized; (g) warn Decedent of the peculiar risk posed by the power lines, a risk unusual to the work being performed; (h) make Decedent aware of the latent danger/risk that the power lines would pose when working in close proximity to those lines, "and which constituted a latent defect[,] since they had not been de-energized; and/or (j) advise Decedent that there were power lines running through the tree that were hidden or unable to be seen. *Id.* at 8-9. Arnold further argues that the evidence established that the Wellers were aware that power lines are dangerous, that the lines could be "problem," and that the lines were "running close to the tree." *Id.* at 13. Arnold asserts that the evidence met the criteria for establishing liability under the Restatement (Second) of Torts § 343A. *Id.* at 10.

In its Opinion, the trial court addressed Arnold's claim and concluded that it lacks merit. Trial Court Opinion, 2/18/16, at 6-15. We agree with the sound reasoning of the trial court, and affirm on the basis of the trial court's

Opinion with regard to Arnold's first claim. **See id.** We additionally observe the following.

"[G]enerally, landowners employing independent contractors are exempt from liability for injuries to an independent contractor's employees absent an exercise of control over the means and methods of the contractor's work[.]" **Farabaugh**, 911 A.2d at 1273. However, Section 414 of the Restatement (Second) of Torts, which has been adopted in Pennsylvania, sets forth one such exception to this general rule by imposing liability on the landowner when the owner retains control over the manner in which the work is done:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414.

Our review of the record discloses no evidence that the Wellers retained control over any part of the work. Further, when viewed in a light most favorable to Arnold, the evidence established that the danger posed by the electric line was known and obvious to Kaposy. The evidence established that on the day of the incident, Decedent rode with Kaposy to the Wellers' residence. N.T., 2/17/14, at 31. During that ride, Kaposy discussed the presence of power lines at the job site with Decedent. **Id.** at 31, 56. Once at the Wellers' residence, Kapsoy told Decedent to pay

attention to Kaposy's inspection of the job site. *Id.* at 32. At that time, Kaposy testified, he inspected the tree in relation to the power lines:

> I looked at it a couple of different times. I walked around the tree and looked at everything. I looked at the angle of the limbs coming up compared to where the high voltage was at, and there was probably 12 foot, ten to 12 foot of clearance between where the limbs were and where the voltage line [*sic*].

*Id.* at 33. Kaposy further indicated that electricity was an issue in every job. *Id.* at 35, 55-56. Thus, when viewed in a light most favorable to Arnold, the evidence established that the danger posed by the power lines was known and obvious to Kaposy.

Arnold next claims that the trial court improperly granted summary judgment against him and in favor of Duquesne Light. Brief for Appellant at 15. Arnold asserts that Duquesne Light was negligent for, *inter alia*, failing to trim the tree at or near the distribution line; failing to divert, relocate, remove or properly inspect that line; failing to place a device(s) to minimize/eliminate the dangerous condition; failing to comply with applicable codes, standards and/or regulations with regard to the tree/lines; failing to adequately warn of the inherent danger created by the line; failing to exercise the highest degree of care; and failing to perform periodic and routine safety inspections. *Id.* at 15-16.

Upon our review of the parties' briefs and the certified record, we agree with the trial court's conclusion that Arnold's claim lacks merit. ***See***

Trial Court Opinion, 2/18/16, at 15-20. We therefore affirm on the basis of the Trial Court's Opinion with regard to this claim. *See id.*

In his third claim, Arnold asserts that in granting summary judgment in favor of Defendants, the trial court improperly resolved factual issues, "notwithstanding language couching the decision as an absence of any genuine issue of material fact as to whether [] Defendants breach any duty of care owed to [Arnold and the Decedent]? Brief for Appellant at 24. Arnold asserts that the trial court improperly determined the credibility of the report filed by Sam Sero, P.E. ("Sero"). *Id.* at 26.

Our review discloses that the trial court did not render credibility determinations regarding the content of Sero's Report. Rather, the trial court addressed whether the statements of fact contained in the Report are supported by any evidence of record, and whether Sero indicated that he was qualified to render an opinion as to certain statements contained in the Report. *See* Trial Court Opinion, 2/18/16, at 9-12 (discussing deficiencies in Sero's Report), 15-18 (discussing the lack of evidence supporting Sero's conclusions). We discern no error or abuse of discretion by the trial court regarding its analysis and conclusions. Accordingly, Arnold is not entitled to relief on this claim.

For the foregoing reasons, we affirm the Order granting summary judgment in favor of Defendants.

Order affirmed.

- 8 -

J-A20038-16

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016

GO 12 - 006927

O'BRIEN, J.

OPINION

On October 28, 2015, plaintiff appealed from my order granting summary judgment to defendants Kayla Weller, Matthew Weller and Duquesne Light Company. Plaintiff offered the following factual summary and legal arguments in opposition to defendants' motions for summary judgment:

> The within action arises out of the fatal injuries that Eric Arnold, deceased sustained on April 20, 2010 while present as an invitee or licensee on the premises possessed by the Defendants, Kayla Weller and Matthew Weller, (hereinafter the 'Wellers.")

> On April 17, 2012, the Plaintiff instituted this action by filing a Praecipe for Writ of Summons. Thereafter, the Plaintiff filed a Complaint, which avers that the Wellers hired the Defendant, Richard Kaposy, to remove a tree from their property located at 4737 Robert Drive, Pittsburgh, Allegheny County Pennsylvania 15102. On April 20, 2010, Eric Arnold, deceased[,] and Larry Arnold, his brother, were working for Richard Kaposy and were on the Wellers['] property to remove the tree. While Eric Arnold, deceased[,] was trimming the subject tree, a tree limb came in contact with a 13.2kV overhead primary electric distribution line or arcing electric discharge from the line causing him to be electrocuted. Larry Arnold was present and witnessed the horrible death. The Complaint avers that the Wellers as the owners of the property owed a general duty of reasonable care to the Plaintiff.

● ● ●

> The Plaintiff's Complaint specifically avers that the Welters were possessors of the subject premises where the incident occurred. The Plaintiff's Complaint also specifically averred that Eric Arnold, deceased[,] was a business invitee on the Wellersf] property. Under these circumstances, the Wellers may be held liable to the Plaintiff. Pennsylvania Law follows Section 343A of the Restatement of Torts which provides:

>> § 343A. Known or Obvious Dangers
>> (1)A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

1

• • •

Here, the Wellers meet the criteria for liability under§ 343A. The Wellers were possessors of the property. The harm was caused by the danger of the electric distribution line that was known to the Wellers. The Wellers allege that the electric distribution line was an open and obvious condition. The danger, however, was not necessarily known to Eric Arnold, deceased because it was hidden in the tree and was not an obvious danger. It has been held that the presence of power lines in and of itself does not indicate obvious danger and a person is not bound to know the degree of danger involved. Power lines may be harmless or in the highest degree dangerous and the difference in this respect is not apparent to ordinary observation and the public[,] while presumed to know that danger may be present[,] are not bound to know its degree in any particular case. *Stark v. Lehigh Foundries, Inc.,* infra. Accordingly, the electric distribution line was not an obvious danger to Eric Arnold, deceased.

Generally an owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty to the employees of the independent contractor with respect to an obviously dangerous condition. *Brletich v. U.S. Steel Corp.,* 285 A.2d 133 (Pa. 1971).

A landowner may be liable for the injuries of someone working on their property when there exists a "peculiar risk." The "peculiar risk" doctrine was endorsed by the Pennsylvania Supreme Court when it adopted sections 416 and 427 of the Restatement (Second) of Torts in *Philadelphia Electric Co. v. James Julian, Inc.,* 228 A.2d 669 (Pa. 1967). In. order for the landowner to be liable the risk must have been foreseeable to the landowner at the time he entered into a contract and the risk must be unusual to the general type of work done. The decision of whether the risk was unusual with regard to the work to be performed is a question for the Court. *Ortiz v. Ra-E/ Development Corp.,* 528 A.2d 1355 (Pa. Super. 1987).

The risk that the electric distribution line posed was unusual to the work to be performed because it is not one of the known risks associated with cutting down a tree such as being cut by a saw or falling from a tree.

Eric Arnold, deceased[,] was on the Wellers['] premises not only for his employer, but also for the interest of the Wellers and was entitled to assume that the Welters had performed their affirmative duty to keep the premises in a reasonably safe condition or warn of dangers thereon, which the Wellers knew or should have known existed. Since the electric distribution line was not patently obvious, Eric Arnold, deceased was not required to make an independent survey to determine whether the Wellers had performed their duty.

2

The report of Samuel J. Sera, P.E. of Renaissance Engineering (Exhibit A in Appendix) addresses the negligence of Kayla Weller and Matthew Weller. Sera researched and analyzed the incident on behalf of the Plaintiff and determined that the Wellers failure to notify the tree trimming contractor of the potential electrical hazard was a proximate cause of Eric Arnold's death.

Additionally, the Wellers failed to keep the premises in a reasonable safe condition by failing to request that Duquesne Light de-energize the overhead power line while work was being performed on the premises that would bring workers in close proximity to the power line. Kayla Weller admitted at her deposition that she never contacted Duquesne Light Company and requested that they turn off the main power line prior to the incident. (See Deposition transcript of Kayla Weller, Page 12: 25-13: 1-3 Exhibit 8 in Appendix.)

Matthew Weller admitted at his deposition that he knows power lines are dangerous. (See Deposition transcript of Matthew Weller, Page 16: 14 Exhibit C in Appendix.) Kayla Weller was aware that the wires could be a problem and in fact asked Richard Kaposy if thwires were a problem. (See Deposition transcript of Kayla Weller, Page 9: 11-12 Exhibit 8 in Appendix.) Mr. Weller asked Richard Kaposy if any precautions were being taken. (See Deposition transcript of Matthew Weller, Page 15: 7-9 Exhibit C in Appendix.) Ms. Weller was also aware that there were power lines running close to the tree. (See Deposition transcript of Kayla Weller, Page 10: 24-11: 2 and Page 18: 3-5 Exhibit

8 in Appendix.) Mr. Weller was also aware that tree was pretty close to the power lines. (See Deposition transcript of Matthew Weller, Page 14: 20-23 Exhibit C in Appendix.)

The Wellers, however, failed to advise Eric Arnold, deceased[,] that he would be in close.proximity to the power line that would expose him to the lethal hazard of electrocution. Kayla Weller admitted that she never told any employees of Richard Kaposy and specifically Eric Arnold to be careful because of the power line. (See Deposition transcript of Kayla Weller, Page 11: 10-12 Exhibit 8 in Appendix.) Matthew Weller also admitted that he never told any employees of Richard Kaposy to be careful cutting down the tree because of the power line and in fact never spoke to Eric Arnold. (See Deposition transcript of Matthew Weller, Page 17: 20-23 and Page 18:5-8 Exhibit C in Appendix.)

Accordingly, the Wellers breached their duty to Eric Arnold, deceased, a business invitee, by failing to protect him from foreseeable harm and obvious danger.

In the alternative, issues of material fact clearly exist as to whether the Wellers knew or should have known of the "peculiar risk" that the electric

distribution line posed running through the tree at the time they hired Rick Kaposy to cut down the tree on their property....

Plaintiff's unpaginated Supplemental Response to Motion for Summary Judgment of

Kayla Weller and/or Matthew Weller.

Plaintiff's summary/argument in opposition to the motions for summary judgment

continued as follows:

The report of Samuel J. Sero, P.E. of Renaissance Engineering[,] (Exhibit A in Appendix) addresses the negligence of Duquesne Light. Mr. Sero researched and analyzed the incident on behalf of the Plaintiff and determined that the distribution line that the Plaintiff's decedent contacted and subsequently electrocuted him ran through the tree on the Wellers' property. He also determined that the tree had not been trimmed, which violates the applicable codes, standards, and/or requirements that power lines be maintained in a safe manner.

Mr. Sera states in his report that it is recognized in the utility industry that branches[] which overhang power lines represent a significant hazard not only to the operation of the line, but to the safety of the general public, which would include the Plaintiff's decedent. The proximity of the distribution line to the tree constituted a dangerous, hazardous, and life threatening condition to all persons trimming the t.ree or cutting it down. This dangerous/hazardous condition was caused by and/or permitted to continue knowingly by Duquesne Light.

Duquesne Light is required under the National Electric Safety Code (hereinafter "NESC") to maintain their lines for the safeguarding of persons during the installation, operation, and maintenance of electric supply lines. Under rule 214A.2 of the NESC, Duquesne Light is required to perform line inspection at such intervals as experience has shown to be necessary. The last pole line inspection prior to the event was 2008. Under rule 218.A of the NESC Duquesne Light was required to do tree trimming such that trees that may interfere with ungrounded supply conductors should be trimmed or removed.

At the line inspection in 2008, the tree branch may not have extended out over the line[;] however, its direction of growth would have been apparent and should have been recognized as a potential hazard. On November 21, 2011, the date of inspection of the scene by Mr. Sera, Mr. Weller advised him that the tree was of significant size both in height and outgrowth away from the trunk. Even in 2008 the size and growth pattern of the tree would have been easily recognized.

Samuel J. Sera, P.E. concluded after his investigation and research within a reasonable degree of engineering certainty that Mr. Arnold's electrocution death was in part caused by the failure of Duquesne Light to recognize and effectively

deal with the potentially deadly hazard presented by the tree over growing their 7.2KV power line wire.

Duquesne Light[ ] has known for decades that power lines must be maintained in a safe manner. Duquesne Light[] has trimmed trees at numerous other locations to provide adequate clearance for lines carrying this voltage. Trimming the tree on the Wellers' property before the incident would have eliminated the dangerous/hazardous condition that resulted in the death of the Plaintiff's decedent.

Jennifer Arkett[,] a representative of Duquesne Light[,] admitted at her deposition that Duquesne Light is responsible for the maintenance of vegetation that could interfere with their facilities. (See Deposition transcript of Jennifer Arke, Page 14:24- Page 15:1 Exhibit B in Appendix.)

Scheduled maintenance was done by Lewis Tree Service in 2008, on behalf of Duquesne Light on the circuit that included Robert Drive. (See Deposition transcript of Jennifer Arkett, Page 20: 4-10 Exhibit Bin Appendix.) Vegetation maintenance is done every four to five years and the maintenance is based on the years of growth, species of the tree, growth rate, health of the tree, and proximity to the line. (See Deposition transcript of Jennifer Arkett, Page 33: 14-
16 and Page 35:14-16 Exhibit Bin Appendix.) Ms. Arkett stated at her deposition that Duquesne Light tries to keep electrical wires free of tree limbs and this is done through clearance pruning. (See Deposition transcript of Jennifer Arkett, Page 39: 2-7 Exhibit B in Appendix.)

The Duquesne Light Company Technical Specifications for Line Clearance and Vegetation Management of Right-Of Way (sic) specifically provides that pruning shall be performed to provide a minimum of four (4) years (six (6) years for transmission) of clearance... for all circuits existing on a pole or structure. The illustration in Appendix B1b indicates that six (6) years of pruning clearance should be maintained with developed transmission rights-of way. (sic) {See The Duquesne Light Company Technical Specifications for Line Clearance and Vegetation Management of Right-of Way (sic) Exhibit C in Appendix.)

Clearances for trees in urban-type rights-of-way shall basically be regained with additional attention paid to the normal growth in the remainder of the tree that may warrant pruning. (See The Duquesne Light Company Technical Specifications for Line Clearance and Vegetation Management of Right-Of Way (sic) Exhibit C in Appendix.)

The tree is to be pruned further away from the line if it grows faster. (See Deposition transcript of Jennifer Arkett, Page 54: 10-12 Exhibit Bin Appendix.) Based on the growth rate, a minimum of four years of clearance needs to be achieved applying proper pruning cuts. (See Deposition transcript of Jennifer Arkett, Page 54: 14-16 Exhibit Bin Appendix.)

Joseph Cataldo, Jr.[,] a representative of Duquesne Light[,] admitted at his deposition that the line involved in the incident was inspected in 2008. (See Deposition transcript of Joseph Cataldo, Jr., Page 24: 21-23 Exhibit D in Appendix.) Inspections include looking for vegetation or anything that could potentially cause an outage or a public safety issue. (See Deposition transcript of Joseph Cataldo, Jr., Page 30: 15-22 Exhibit D in Appendix.) Mr. Cataldo admitted that vegetation issues can pose public safety issues. (See Deposition transcript of Joseph Cataldo, Jr., Page 31: 5-7 Exhibit D in Appendix.) Mr. Cataldo stated that if branches are interfering with power lines that fall inside their right-of-way, they would trim them. (See Deposition transcript of Joseph Cataldo, Jr., Page 36: 17-19 Exhibit D in Appendix.)

In light of the known dangers and hazard posed by failing to trim the tree on the Wellers' property, Duquesne Light's failure to trim the tree near the power line was willful, wanton, reckless, outrageous, and contributed materially and substantially to the death of the Plaintiff's decedent.

Duquesne Light[ ] had or should have had actual notice of the dangerous condition caused by the distribution line near the tree located at the premises. Duquesne Light was negligent and breached its duty to the Plaintiff's decedent. As suppliers of electricity, Duquesne Light has a recognized duty to exercise the highest degree of care practicable to avoid injury to everyone who may be      · lawfully in proximity to its wires. Duquesne Light[ ] had a duty to the Plaintiff's decedent of the highest standard of care to avoid/prevent injury from foreseeable and anticipated events, such as the events of April 20, 2010. Duquesne Light was negligent in failing to recognize and effectively deal with the potentially deadly hazard presented by the tree growing over their 7.2KV power line wire.

Clearly issues of material fact exist as to whether Duquesne Light breached their duty to the Plaintiff's decedent by failing to take action to prevent the incident that occurred. Duquesne Light has failed to meet its burden of demonstrating the lack of a genuine issue of material fact...

Plaintiff's unpaginated Supplemental Response to Motion for Summary Judgment of

Duquesne Light Company; original bold print.

## DISCUSSION

Plaintiff seeks to predicate liability against the Welters on the Restatement

(Second) of Torts §343A. Alternatively, he asserts the peculiar risk doctrine.

There is, however, no evidence of record which creates an issue of fact as to either theory.

Section 343A(1) of Restatement (Second) of Torts, Known or Obvious Dangers, provides as follows:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

Comment e to subsection (1) states:

> In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor so obvious to him that he may be expected to discover them therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.

The "peculiar risk" doctrine

> was endorsed by our Supreme Court when it adopted sections 416 and 427 of the Restatement (Second) of Torts in *Philadelphia Electric Co. v. James Julian, Inc.,* 425 Pa. 217, 228 A.2d 669 (1967). A "peculiar risk" (or "special danger") exists when: {1) a risk is foreseeable to the employer of an independent contractor at the time the contract is executed (that is, if a reasonable person in the position of the employer would foresee the risk and recognize the need to take special measures); and (2) the risk is different from the usual and ordinary risk associated with the general type of work done {that is, the specific project or task chosen by the employer involves circumstances that are substantially out-of-the-ordinary).

*Gutteridge v. A. P. Green Services, Inc.,* 804 A.2d 643, 656-57 (Pa. Super. 2002).

GO 12- 006927

The duty owed by an owner of land to a visitor is dependent on that visitor's status. "A landownr owes a duty to warn an unknowing independent contractor of existing dangerous conditions on the landowner's premises where such conditions are known or discoverable to the owner." *Col/oi v. Philadelphia Electric Company* [PECO], 481 A.2d 616, 619 (Pa. Super. 1984). The Pennsylvania Supreme Court has recognized that a possessor of land is generally insulated from liability to an invitee if it is reasonable for the owner to believe that the dangerous condition would be obvious to and discovered by his invitee. Further, a possessor has no obligation to warn an independent contractor of dangers that would be at least as obvious to the contractor as to the owner. *Gutteridge,* supra. As a general rule, when a possessor of land "turns the work over to an independent contractor with experience and know-how, who selects his own equipment and employees, the possessor of land has no further liability in connection with the work to be done." *Brletich v. United States Steel Corporation,* 285 A.2d 133, 136 (Pa. 1971); (emphasis added).

Pennsylvania courts have synthesized these principles and concluded "[t]he question of whether a landowner owes duty to warn an independent contractor of dangerous conditions on the premises turns on whether the owner possesses 'superior knowledge' or information which places him in a better position to appreciate the risk posed to the contractor or his employees by the dangerous conditions." *Gutteridge,* 804 A.2d at 657-58, citing *Colloi;* emphasis added.

Plaintiff introduced no evidence to create an issue of fact as to whether the Wellers were in a better position to appreciate the risks compared with the tree removal contractor. Encountering power lines is obviously an ordinary risk associated with the

8

GD 12 - 006927

removal of large trees in residential areas. Plaintiff failed to establish a *prima facie* case as to the Wellers' liability under either §343A or the peculiar risk doctrine.

Plaintiff's claims against both the Welters and Duquesne Light rely heavily on the two reports authored by Samuel J. Sera, a professional engineer. [1] While Sera appears to have visited the scene of the accident, [2] it appears undisputed the tree at issue was cut down before his visit. His first report, dated November 20, 2014, references visiting the scene and speaking with Mr. Weller.

> In the second paragraph Sera recites how the accident
>
> occurred: When Mr. Arnold cut the branch away from the
>
> tree it fell
> onto the single phase conductor installed on a pole top pin
> on the pole line. The branch was then energized at 7.2 KV,
> the line to ground voltage of a single phase of a 12 KV circuit.
> When Mr. Arnold touched the branch to clear it he became
> part of the circuit to ground of the 7.2 KV thru (sic) the branch
> and then thru (sic) his body.

He does not explain how he acquired information about the tree, aside from a reference to Mr. Weller's statement that "the tree was of significant size in height and outgrowth away from the trunk." Sera then concludes "[i]t is obvious from the physical nature of the accident that the end of [the] branch towards the street had to have been located directly above the 7.2 KV line in order to fall down and remained propped in place from the overhead conductor back to the tree and

38

[decedent]." The report [3] fails to cite any evidence in support of this conclusion. In

---

[1] Sere's resume does not appear to be of record. Since only the typed name of "Samuel J. Sero" appears at the end of the reports, rather than a signature, it is not certain whether Sero actually authored them. However, for the purposes of the motions for summary judgment, I assumed Sero was an expert professional engineer and authored the reports .

[2] Although his first report states Renaissance Engineering was requested to examine the scene, and from certain statements contained in said report it could be inferred that Sero visited the scene of the accident, nowhere in the report does he actually state he visited the scene.

[3] The date on the Report is November 20, 2014. The report states Renaissance Engineering inspected the site on November 21, 2011, over eighteen months after the accident..

9

GO 12 - 006927

fact, in forming his opinion, Sera relies on a false assumption. He states:

> In 2003, the last noted line inspection at the scene, the branch may not have extended out over the line, however its direction of growth would have been apparent and should have been recognized as a potential hazard. On 11/21/11, the date of inspection of the scene by Renaissance Engineering, Mr. Weller stated that the tree was of significant size both in height and outgrowth away from the trunk. Even in 2003 the size and growth pattern of the tree would have been easily recognized.

> The Welters, owners of the property, were aware of the growth of the tree into the area of the power line and may have even experienced temporary outages from the tree contacting the line. With this knowledge the Welters had an obligation to notify Kaposy, the tree trimming company operating under anyone of the Kaposy DBA's' {sic) that they ontracted with, of this danger.

Sera goes on to conclude that the Wellers' failure to notify Kaposy of the potential electrical hazard was a proximate cause of the death. The assumed last inspection date of 2003 was based on a pole tag found at the scene. Sera speculates there **may** have been temporary outages. There is, however, no evidence of any power outages related to the tree at issue. Moreover, as noted in Sera's second report, the tree was trimmed by Duquesne Light, via Lewis Tree Service, in 2008. Thus, the tree was seen by a representative of Duquesne Light just two years before the accident, not seven.

As noted in *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 849 {Pa. Super. 2012),

39

The law provides that expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

Although a court must view all evidence in the light most favorable to the non-moving party in ruling on a motion for summary judgment, the non-moving party must present

10

more than a mere scintilla of evidence in its favor and may not rely upon unsupported assertions or conclusory allegations. *Zimmerman v. Southeastern Pennsylvania Transportation Authority,* 17 F. Supp. 2d 372 (E.D.Pa. 1998). As explained by the Court in *Harris v. NGK North American, Inc.,* 19 A.3d 1053 (Pa. Super. 2011):

> All facts and reasonable inferences therefrom must be evaluated in a light most favorable to the non-moving party at the summary judgment stage...This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

Id. at 1066; emphasis added; citations omitted. In the· present case the conclusions in Sera's first report are not supported by fact. Sera's second report, dated July 7, 2015, reads in its entirety as follows:

> Based upon documents received from 5/12 – 7/7/15, [Duquesne Light Company] responses to interrogatories, the following has been ascertained:
>
> 1} At some time in 2008 tree trimming was done by Lewis Tree. This was not the same as the Duquesne Light Inspection that was performed at the subject incident poles in 2003 and tagged as such. At this 2003 point in time the tree should have been tagged as a danger to the line by virtue of its growth pattern towards the line.

40

2} In 2008 Lewis was required to trim the tree back a distance that is equivalent to a 4 year growth. This is in reality a distance of 10 feet plus four year growth. In order for unqualified persons to work on the tree on the owners['] property and keep 10 feet away from the power line with a conductive object, which includes a conductive tree branch, the power company, DLCO, must provide the ten feet and maintain the ten feet plus the four year growth distance.

3) In 2008 it was impossible for the tree to be four years growth plus 10 feet from the power line as shown by the branch falling onto the power line in 2010.

Emphasis added. Sera fails to state the facts and authorities he relies upon in making these statements. He apparently never viewed the actual tree at issue or established its

11

GO 12 - 006927

species. No evidence has been proffered to establish his expertise in tree growth. Sera does not reference any Duquesne Light or Lewis Tree reports, records, photographs or videos to support his conclusion that the tree was not trimmed the appropriate amount in 2008. Paragraph 3 of his second report appears to be based on the theory that the tree could not have been trimmed the appropriate distance from the power line because the limb decedent cut hit the power line. Further, nowhere in his second report does Sera opine Duquesne Light was negligent. There are no facts in the second report from which reasonable inferences could be drawn to create an issue of fact as to whether Duquesne Light was negligent.

Plaintiff relies on *Stark v. Lehigh Foundries, Inc.*, 130 A.2d 123 (Pa. 1957), as a basis for imposing liability on both the Wellers and Duquesne Light. There Lehigh owned and operated an industrial plant and railroad siding. Metropolitan Edison's power lines ran above and across the siding. Lehigh hired Posh Construction to furnish a crane, operator and helper to unload Lehigh's shipments. Engler was the crane operator and Stark was the helper. The work was directed by Lehigh's foreman. He

41

testified that on the day of the accident he directed the crane operator where the unloading was to be done and spotted railroad cars under the high tension wires, whereas the previous day the cars were a safe distance away from the lines. While preparing to remove the crane from the premises, Engler brought the crane close to the power lines, causing the current to arc from the lines to the crane boom and through Stark's body. [4] Although the jury found Lehigh, Posh and Metropolitan Edison negligent, the trial court granted Metropolitan's motion for judgment n.o.v.. The Supreme Court

---

[4] Stark survived the accident .

12

GD 12 - 006927

affirmed the trial court.

Lehigh contended the condition was obvious and apparent and that Stark made no showing Lehigh had knowledge of arcing, flaring or discharge superior to that of Engler and Stark. Both arguments were rejected. The Court found that while Stark was aware of the power lines, he was not aware of the high voltage or the danger of arcing. The Court stated:

> Lehigh had actual knowledge of the danger involved. Lehigh's president testified that he knew that cranes were operated from time
> to time in the vicinity of the power lines; that he knew of the high voltage carried in the lines; and that he knew also of the phenomena of arcing. In spite of this knowledge, no warning of the danger was given to Lehigh's foreman or its employees or to Posh and his employees, Stark and Engler. It is admitted of record that Lehigh did not notify Posh that the work was to be performed immediately underneath the power lines.

● ● ●

> The presence of the power lines in and of itself did not indicate obvious danger. Plaintiff was not bound to know the degree of dang

42

r involved. Wires charged with an electric current may be harmless,
or
they may be in the highest degree dangerous. The difference in this respect
is not apparent to ordinary observation, and the public, therefore, while
presumed to know that danger may be present, are not bound to know
its degree in any particular case.

Lehigh, on the other hand, *was bound* to know the degree
of danger involved. Those handling electricity of high voltage
are not only bound to know the extent of the danger but to use
the
very highest degree of·care practicable to avoid injury to
everyone who may be lawfully in proximity to such wires and
liable to come accidentally or otherwise in contact with them.

*Id.* at 128; citations, quotes and asterisks omitted; original italics. The Court concluded

there was no proof Stark knew of the potential danger involved. In fact, the proof was

to

the contrary.

With respect to the Wellers' potential liability instantly, the facts of record are clearly

GO 12- 006927

distinguishable from *Stark*. There is no evidence the Wellers handled electricity of high

voltage or were aware of the degree of danger involved. They relied on Kaposy's

expertise and did not direct the manner in which the work was performed.

Plaintiff also relies on *Colloi, supra*. In *Colloi*, PECO experienced a leak in the

water sprinkler system at its substation. PECO contacted a plumbing company, Joseph

Scholl, Inc., who subcontracted with Herald Contractors to perform the excavation work

and repair the leak. Colloi was one of Herald's employees. Colloi began jackhammering

the sidewalk at the spot indicated by PECO, Scholl and Herald's foreman. He found the

leak and was breaking up the concrete around the pipe when he was injured after

striking an electrical conduit carrying a current of 13,200 volts. The trial court granted

43

PECO's motion for directed verdict. The Superior Court reversed, finding it was a jury question whether "PECO met the high degree of care imposed on handlers of high-voltage electric power, or fulfilled its duty to warn the independent contractor of non-obvious dangers on the premises." *Id.* at 295. It was undisputed PECO took no steps whatsoever to warn the independent contractor or its employees of a highly dangerous condition existing where the excavation was being conducted. The danger posed by a 13,200 volt power line lurking within the concrete structure was not suspected by the workers. PECO had site blueprints, charts and diagrams of the electrical lines emanating from the substation and had an employee present at the scene, yet failed to warn that the concrete structure housed a power line. These facts did not present an obviously dangerous condition to plaintiff and the issue of PECO's liability should have been submitted to the jury. PECO was both the owner of the premises and a supplier of electric power. It had a superior knowledge of a non-

14

GO 12 - 006927

obvious dangerous condition. In the instant case the Wellers were not suppliers of electric power; nor was there evidence of record they possessed any superior knowledge with regard to the high voltage line that was clearly visible. Thus, *Colloi* does not support plaintiff's position.

Sera opines Duquesne Light was negligent in trimming the tree in 2008 because it should have known that due to the way the tree was growing, it was not sufficiently trimmed to last for four years without growing into the power line. Sera further opines Duquesne Light was negligent in violating §§214.A.2. and 218A.1. of the National Electrical Safety Code (NESC). Neither plaintiff nor Sera produced the

44

text of the NESC sections relied upon. Since the NESC is amended every five years, the 2007 NESC was apparently the version in effect at the time of the accident.

The NESC states as follows:

> An American National Standard implies a consensus of those substantially concerned with its scope and provisions. An American National Standard is intended as a guide to aid the manufacturer, the consumer, and the general public. The existence of an American National Standard does not in any respect preclude anyone, whether he has approved the standard or not, from manufacturing, marketing, purchasing, or using products, processes, or procedures not conforming to the standard.

There is case law stating that while the NESC does not have the force of law, it is voluntarily accepted as a minimum standard by the electrical industry. See *Densler v. Metropolitan Edison Company,* 345 A.2d 758 (Pa. Super. 1975); *Poorbaugh v. Pennsylvania Public Utility Commission,* 666 A.2d 744 (Pa. Cmwlth. 1995).

Section 214A.2. of the NESC, Inspection, provides:

> Lines and equipment shall be inspected at such intervals as experience has shown to be necessary.

15

GO 12 - 006927

> NOTE: It is recognized that inspections may be performed in a separate operation or while performing other duties, as desired.

Section 218 of the NESC, Vegetation management, subsection

A.1. provides: Vegetation that may damage ungrounded supply

> conductors
> should be pruned or removed. Vegetation management should be performed as experience has shown to be necessary.

> NOTE: Factors to be considered in determining the extent of vegetation management required include, but are not limited to: line voltage class, species' growth rates and failure characteristics, the potential combined movement of vegetation and conductors during winds, and sagging conductors due to elevated temperatures or icing.

45

Clearly, §218.A.1 is aimed at protecting the lines, not people working near the lines. There is no evidence of record Duquesne Light violated either of these sections.

Excerpts of the deposition of Jennifer Arkett, who is in charge of vegetation maintenance for Duquesne Light, are attached as Exhibit B to plaintiff's Appendix to Supplemental Response to Duquesne Light Company's Motion for Summary Judgment. Arkett testified the NESC's provision regarding tree trimming is vague and Duquesne Light followed more stringent standards. (T-16) Attached to plaintiff's Appendix as Exhibit C is the December 2007 Revision of Duquesne Light's "Technical Specifications for Line Clearance and Vegetation Management of Rights-of-Way" and attached schedules and appendixes. Page 16, Pruning Clearance Requirements, provides:

> Pruning shall be performed to provide a minimum of **four-** {4) years {Six – {6) years for transmission) of clearance **{APPENDIX 81)** for all circuits existing on a pole or structure..."

There are specific requirements including, among other things, what to look for and how to make cuts. Appendix A6a – Growth Chart lists types of trees and estimated

16

growth projections. The accident occurred on April 20, 2010. Arkett testified scheduled maintenance was performed on the tree in March of 2008. (T-20,33). She also testified Duquesne Light adheres to the strict standards of the Pennsylvania Public Utility Code. 52 Pa. Code §57.198, Inspection and maintenance standards, subsection (n)(1) provides:

> *Inspection and maintenance intervals.* An EDC[5] shall maintain the following inspection and maintenance plan intervals:
>
> (1) *Vegetation management.* The Statewide minimum inspection and treatment cycle for vegetation management is between 4-8 years for distribution facilities...[6]

Original italics. There is no evidence of record that Duquesne Light violated the NESC, its own internal standards or any Pennsylvania Public Utility Code provisions.

Sera's initial report states the tree was last trimmed in 2003. Then, in his second report, he acknowledges it was trimmed in 2008 by Lewis Tree Service, but states "this is not the same as the Duquesne Light Inspection that was performed at the subject incident poles in 2003 and tagged as such. At this 2003 point the tree should have been tagged as a danger to the line by virtue of its growth pattern towards the line." There is no evidence of record as to the nature and extent of the work done in 2008 to support this statement. Even assuming Sera is a tree expert, and the tree was a maple,[7] Appendix A6a-Growth Chart [8] lists 6 types of maples with different growth rates. Different species of trees have different growth rates. Sero makes no reference

---

[5] "EDC" stands for electric distribution company.See 52 Pa.Code §54.152.

[6] Although 52 Pa.Code §57.198 was adopted September 27,2008,5 months after the date of Duquesne Light's inspection,Arkett's testimony demonstrated that at the time of the accident,Duquesne Light was in compliance with the more stringent standards adopted by the Pennsylvania Public Utility Commission. .

[7] At her deposition Arkett was asked about the growth of a maple tree.

[8] The'Growth Chart is an Appendix to the Duquesne light's "TECHNICAL SPECIFICATIONS FOR LINE CLEARANCE AND VEGETATION MAINTENANCE RIGHTS-OF-WAY,attached as Exhibit C to Plaintiffs Appendix to Supplemental Response to Motion for Summary Judgment of Duquesne light Company.

17

GO 12 - 006927

to the type or species of the tree involved. Any opinion by Sera that Duquesne Light should somehow have known the tree in question allegedly had a faster growth pattern and should have been pruned more in 2008 is without foundation.

In his initial report Sera states:

> It is obvious from the physical nature of the incident that the end
> of the branch towards the street had to have been located directly
> above the 7.2 KV line in order to fall down and remained propped
> in place from the overhead conductor back to the tree and Mr. Arnold.

47

It is apparent that the branch end over the phase wire had to have been very close to the wire since no damage was done to the wire.

As noted previously, however, the tree was cut down after the accident. Sera fails to refer to any evidence, facts or measurements to support his conclusion, which is also based on his belief the tree was last trimmed in 2003 when, in fact, was it trimmed in 2008. In paragraph 3 of his second report he states, without any supporting facts, "in 2008 it was impossible for the tree to be four years growth plus 10 feet from the power line as shown by the branch falling onto the power line in 2010."

Given that Duquesne Light had no knowledge of the tree job and that Sera's conclusory opinions are unsupported by facts, there is no evidence of record to establish a *prima facie* case that Duquesne Light was negligent in failing to trim the tree the appropriate amount in 2008, or that Duquesne Light violated any NESC or other applicable standards.

Neither *Stark* nor *Colloi* supports plaintiff's position as to Duquesne Light's liability. *Stark* actually supports Duquesne Light's entitlement to summary judgment. There, as noted previously, judgment n.o.v. was granted as to Metropolitan Edison. The following language from the trial court's opinion was quoted with approval by the Supreme Court:

18

Plaintiff presented no evidence to suggest that Metropolitan's power lines were defectively constructed or maintained. The principal averment against Metropolitan was its alleged negligence in constructing and maintaining high voltage lines directly over and above a railroad siding, when it knew or should have known that mechanical devices such as mobile cranes would be used for loading and unloading freight cars in dangerous proximity to its wires. This charges Metropolitan with knowledge, actual or implied, that mobile cranes would be used in dangerous proximity to its power lines. In answer to this charge Metropolitan contends that the proofs disclose that it had no knowledge, actual or implied, that cranes would be used in dangerous proximity to its power lines; that the use of mobile cranes underneath its lines was intermittent or occasional, wherefore reasonable inspection was not bound to disclose such use; and that in these circumstances there was no duty upon Metropolitan to anticipate a dangerous condition created by third parties.

The legal principles governing the opposing theories presented are well established and have been reiterated many times. While the degree of care required of one maintaining or operating electric wires is of the highest, the concomitant duty is to install (such) lines in a safe and proper manner and thenceforth to maintain them in a safe condition upon reasonable inspection from time to time.

Where a supplier of electricity has installed its high tension lines in a safe and proper manner on the land of another and has neither knowledge nor notice that the possessor of the land is conducting an activity thereon which makes the line dangerous to people working on the land, it is not subject to liability for the electrocution of a workman resulting from this activity. Before knowledge of a fault or other condition can be visited constructively, the situation must not only have existed a sufficient length of time for its due discovery but it must also be capable of ascertainment upon the inspection, observation or supervision legally required of the one sought to be bound with such knowledge here is no law requiring such an inspection of insulated wires as will make their owner virtually an insurer of the safety of anyone who by any possibility may come in contact with them. All that (is) required under the circumstances here (is) reasonable inspection from time to time. There is no duty imposed upon the supplier of electricity to keep the land underneath the lines under constant surveillance. There is no duty of continuing inspection.

49

*Id.* at 130-132; citations, quotes and asterisks omitted.

In the instant case, it is undisputed Duquesne Light was not notified that

19

trimming/removal was about to occur. Even if credence is given to Sere's opinion that Duquesne Light failed to properly curb tree growth, there is no evidence as to how long this alleged condition might have existed so as to charge Duquesne Light with notice thereof.

BY THE COURT

*O'Brien*

2/18/16

J.